Michael W. Fattorosi, Esq., California State Bar No. 193538
michael@fattlegal.com
Michael D. Kuznetsky, Esq., California State Bar No. 241045
mikek@fattlegal.com
FATTOROSI & ASSOCIATES, P.C.
5850 Canoga Avenue, Suite 400
Woodland Hills, California 91367
(818) 881-8500, Fax: (818) 881-9008

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOELIA LORENZO MONGE, an individual, and JORGE REYNOSO, an individual,<br><br>                    Plaintiffs,<br><br>vs.<br><br>MAYA MAGAZINES, INC., a Florida Corporation, MAYA PUBLISHING GROUP, LLC, a Florida Limited Liability Company, and DOES 1 through 10, inclusive,<br><br>                    Defendants.<br>_____ | CASE NO. CV09-5077R(SSx)<br><br>***[Assigned to District Judge Manuel L. Real and Discovery Magistrate Judge Suzanne H. Segal]***<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGEMENT**<br><br>Date:        June 21, 2010<br>Time:        10:00 a.m.<br>Dept.:        8<br><br>Complaint Filed        July 14, 2009<br>Trial Date:        Nov. 2, 2010 |

///

///

///

1

# TABLE OF CONTENTS

2  **Description**                                                                                          **Page**

3  Table of Contents  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

4  Table of Authorities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

5  I.      INTRODUCTION AND SUMMARY OF ARGUMENT  . . . . . . . . . . . . . . . . . . . . . .  2

6  II.     STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

7          A.      Defendants' Published the Photographs Without Authorization  . . . . . . . . .  3

8          B.      Defendants' Purchased the Photographs from a "Paparazzo" Without Ensuring
                   That They Had the Right to Publish Them  . . . . . . . . . . . . . . . . . . . . . . . .  3
9
10         C.      Defendants Have Paid for the Rights to Publish Other Photographs of
                   Celebrities and Celebrity Weddings  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

11         D.      A Market Exists for Photographs of Plaintiffs  . . . . . . . . . . . . . . . . . . . . .  5

12         E.      Defendants' Earned In Excess of $81,767.21 In Gross Revenues From the
                   Issue of the Magazine Featuring The Photographs  . . . . . . . . . . . . . . . . . .  6
13
           F.      Defendants Have Acknowledged That the Photographs Are Valuable  . . . .  6
14
15  III.    STANDARD OF REVIEW FOR SUMMARY JUDGMENT  . . . . . . . . . . . . . . . . . .  7

16  IV.     DEFENDANTS' FIRST AFFIRMATIVE DEFENSE OF "WAIVER, ACQUIESCENCE
            AND ESTOPPEL" FAILS AS A MATTER OF LAW  . . . . . . . . . . . . . . . . . . . . . . .  8

17         A.      There Is No Evidence of Any Waiver of Known Rights By Plaintiffs In the
                   Photographs  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8
18
19         B.      There is No Evidence of Plaintiffs' Acquiescence to Defendants' Publication of
                   the Photographs  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

20         C.      There is No Evidence To Support That Plaintiffs Should Be Estopped From
                   Asserting Copyright Infringement Against Defendants  . . . . . . . . . . . . . . . .  9
21
    V.      DEFENDANTS'   FOURTH   AFFIRMATIVE   DEFENSE   OF   "INNOCENT
22          INFRINGEMENT" FAILS AS A MATTER OF LAW  . . . . . . . . . . . . . . . . . . . . . . .  11

23  VI.     DEFENDANTS' FIFTH AFFIRMATIVE DEFENSE OF "ACTIONS OF OTHERS" FAILS
            AS A MATTER OF LAW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11
24
25  VII.    DEFENDANTS' THIRD AFFIRMATIVE DEFENSE OF "FIRST AMENDMENT" FAILS
            AS A MATTER OF LAW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

26  ///

27  ///

28  ///

i

1

# TABLE OF CONTENTS

VIII.   DEFENDANTS' SECOND AFFIRMATIVE DEFENSE OF "FAIR USE" FAILS AS A MATTER OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

    A.   Defendants' Preemption of Plaintiffs' First Publication Rights Outweighs a Claim of "Fair Use" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

    B.   Each of the Four Factors of the "Fair Use" Analysis Weighs Against Defendants' Claim of "Fair Use" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

        1.   The Purpose and Character of the Use . . . . . . . . . . . . . . . . . . . . .   16

        2.   The Nature of the Copyrighted Work . . . . . . . . . . . . . . . . . . . . . . .   18

        3.   The Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

        4.   The Effect on the Potential Market for or Value of the Copyrighted Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

IX.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

///

///

///

ii

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Pages**

Anderson v. Liberty Lobby, Inc.,
     477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Brazier Forest Products, Inc., In re,
     921 F.2d 221 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Celotex Corp. v. Catrett,
     477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Elvis Presley Enterprises, Inc. v. Passport Video,
     349 F.3d 622 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . 12, 17, 18, 19

Gener-Villar v. Adcom Group, Inc.,
     509 F.Supp.2d 117 (D. Puerto Rico 2007) . . . . . . . . . . . . . . . . . . . . . . . 10, 11

Hampton v. Paramount Pictures Corp.,
     279 F.2d 100 (9th Cir. 1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

Harper & Row, Publishers, Inc. v. Nation Enterprises,
     471 U.S. 539 (1985) . . . . . . . . . . . . . . . . . . . . 12, 13, 14, 15, 16, 17, 18, 19, 20

Los Angeles News Service v. CBS Broadcasting, Inc.,
     305 F.3d 924 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19

Los Angeles News Service v. Tullo,
     973 F.2d 791 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . 12, 13, 14, 16, 19

Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.,
     475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Pacific and Southern Co., Inc. v. Duncan,
     572 F.Supp. 1186 (N.D.Ga. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Tolliver v. McCants,
     2010 U.S. Dist. LEXIS 4597, *10 (S.D.N.Y., Jan. 21, 2010) . . . . . . . . . . . . . . . 9

Tovar v. U.S. Postal Service,
     3 F.2d 1271 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. King Features Entertainment, Inc.,
     843 F.2d 394 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Walt Disney Productions v. Air Pirates,
     581 F.2d 751 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

///

///

///

iii

1

## TABLE OF AUTHORITIES

2

**Statute**

3     17 U.S.C. § 107  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14, 16, 19

4     17 U.S.C. § 115  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

5     17 U.S.C. § 504  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

6

**Federal Rules of Civil Procedure**

7

8     Rule 56  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7, 8

9     ///

10    ///

11    ///

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iv

**I.**

## INTRODUCTION AND SUMMARY OF ARGUMENT

The essence of this action is that Defendants, MAYA MAGAZINES, INC. ("MAYA MAGAZINES") and MAYA PUBLISHING GROUP, LLC ("MAYA PUBLISHING") published six photographs of Plaintiffs, NOELIA LORENZO MONGE ("MONGE") and JORGE REYNOSO's ("REYNOSO") wedding and wedding night (the "Photographs") in the magazine entitled "TVNotas" without authorization. Defendants claim that Plaintiffs "leaked" the Photographs to a "paparazzo" named Oscar Viqueira with the intent that he forward them on to be published. Further, Defendants maintain that because the wedding was secret, that their publication of the Photographs is protected by the First Amendment. Based thereon, Defendants have pled five affirmative defenses to their copyright infringement: (1) Waiver, Acquiescence, and Estoppel; (2) Fair Use; (3) First Amendment to the United States Constitution; (4) Innocent Infringement; and (5) Actions of Others. However, each of these affirmative defenses (which are discussed out of order below) fail as a matter of law.

As to the first affirmative defense of "Waiver, Acquiescence, and Estoppel," Defendants have no evidence to show that Plaintiffs intended to relinquish any known rights in the Photographs or that Plaintiffs acquiesced to the publication of the Photographs. In fact, the evidence shows that Plaintiffs were unaware of Defendants' intent to publish the Photographs until after they were already published. Further, there is no evidence that Plaintiffs authorized anyone to publish the Photographs.

The fourth affirmative defense of "Innocent Infringement" and the fifth affirmative defense of "Actions of Others" fail as a matter of law because they are not defenses to copyright infringement. Instead, copyright infringement is a strict liability regime. The third affirmative defense of "First Amendment" fails as a matter of law as no court has recognized a First Amendment exception to copyright other than "fair use."

Finally, the second affirmative defense of "Fair Use" fails as a matter of law. Instead of evidencing a course of good faith and fair dealing, Defendants have usurped Plaintiffs' right of first publication in the Photographs. In doing so, Defendants have made a use that is

2

1   commercial and not transformative.  Instead, Defendants have focused solely on exploiting

2   the "heart" of the expression of the Photographs.  If such uses were to become widespread,

3   it would eviscerate the potential market for any photographs of celebrities.

4       As there are no issues of genuine material fact as to the affirmative defenses, partial

5   summary judgment should be granted as to each affirmative defense.

6                                      **II.**

7                            **STATEMENT OF FACTS**

8   **A.     Defendants' Published the Photographs Without Authorization**

9       Prior to January 2009, MAYA PUBLISHING was formerly known as MAYA

10  MAGAZINES.  (Statement of Uncontroverted Facts and Conclusions of Law ("SUF") No. 50).

11  In or about February 2009, MAYA PUBLISHING published six photographs of Plaintiffs'

12  wedding and wedding night (the "Photographs") in Volume 10, Issue Number 633 of the

13  magazine entitled "TVNotas" (the "Magazine").  (SUF Nos. 1, 4).  In addition, Defendants

14  displayed some of the Photographs on their website.  (SUF No. 46).  This is despite the fact

15  that Defendants did not have signed releases to do so.  (SUF Nos. 1, 4, 15).

16      Plaintiffs took some of the Photographs and employees of The Little White Wedding

17  Chapel took some of the Photographs.  (SUF Nos. 47, 48, 90).  The Little White Wedding

18  Chapel assigned any and all rights it had in any of the Photographs to Plaintiffs, and also

19  never authorized Defendants to use the Photographs in any manner.  (SUF Nos. 2, 26).

20  Plaintiffs have obtained copyright registrations for each of the Photographs.  (SUF No. 3).

21  Plaintiffs have never authorized Defendants to use the Photographs in any manner.  (SUF

22  Nos. 16, 21).

23  **B.     Defendants' Purchased the Photographs from a "Paparazzo" Without**

24  **Ensuring That They Had the Right to Publish Them**

25      MAYA PUBLISHING purchased over 400 photographs of Plaintiffs, including the

26  Photographs, from Oscar Viqueira ("Viqueira"), a known "paparazzo," for $1,500.00.  (SUF

27  Nos. 12, 14, 42, 64.)  MAYA MAGAZINES issued the check to purchase the Photographs

28  from Viqueira.  (SUF No. 13).  Juan Garcia Alejandro ("Garcia"), the editor of MAYA

3

PUBLISHING, handled the purchase of the Photographs from Viqueira on behalf of MAYA PUBLISHING and executed the Assignment of Copyright with Viqueira on MAYA PUBLISHING's behalf. (SUF No. 52, 56, 67). Defendants purchased the Photographs with the understanding that they would have exclusive rights to publish them. (SUF No. 68). Out of the 400 photographs of Plaintiffs, Defendants only published the Photographs. (SUF No. 66).

Garcia knows that Viqueira is a "paparazzo." (SUF No. 58). Garcia did not see any releases from Plaintiffs regarding the Photographs and was not provided any documentation about the rights to the Photographs by Viqueira. (SUF Nos. 61, 63). Regardless, Garcia did not ask Viqueira how he obtained the rights to the Photographs. (SUF No. 59). Garcia did not ask Viqueira to see any documentation of Viqueira's rights to the Photographs or to see any releases granting rights in the Photographs. (SUF Nos. 60, 62). Garcia's sole knowledge about what the Photographs actually depict is derived from what Viqueira told him. (SUF No. 57).

Plaintiffs did not know or have any reason to believe that anyone besides Plaintiffs had copies of the Photographs before they were published in the Magazine. (SUF Nos. 5, 9). REYNOSO did not tell anyone about the wedding and did not give copies of the Photographs to anyone. (SUF Nos. 6, 7). In fact, the first time REYNOSO learned that someone else had copies of the Photographs was when his mother called him to tell him she saw the Photographs in the Magazine. (SUF No. 8). Defendants did not pay, or offer to pay, any compensation to Plaintiffs to publish the Photographs. (SUF Nos. 30, 31).

Plaintiffs believe that the Photographs were stolen from them. (SUF Nos. 10, 11). Plaintiffs never authorized Viqueira to use the Photographs in any manner. (SUF Nos. 17, 22). Plaintiffs never gave the Photographs to Viqueira. (SUF Nos. 18, 23). Plaintiffs never even showed the Photographs to Viqueira or discussed them with him. (SUF Nos. 19, 20, 24, 25). REYNOSO did not know Viqueira at the time that Viqueira obtained the Photographs. (SUF No. 27). REYNOSO doesn't even recall if he ever met Viqueira. (SUF No. 28). Viqueira was never an employee of Plaintiffs. (SUF No. 29).

4

1
2

**C.    Defendants Have Paid for the Rights to Publish Other Photographs of Celebrities and Celebrity Weddings**

3   Defendants have paid for the exclusive rights to publish pictures of a wedding,
4   including a celebrity wedding. (SUF No. 71). Defendants even paid for the rights to publish
5   the wedding pictures of Luz Elena Gonzalez in the Magazine. (SUF Nos. 40, 41).
6   Defendants have a budget to send photographers to take photographs for TVNotas and have
7   even paid for their airfare. (SUF Nos. 69, 70). Defendants have paid more than $1,500.00
8   for other photographs. (SUF No. 44).

9   **D.    A Market Exists for Photographs of Plaintiffs**

10   MONGE has been paid for photographs of herself and to pose in photographs in
11   magazines. (SUF Nos. 85, 86). The least MONGE has been paid for photographs of herself
12   was $10,000.00. (SUF No. 87). In fact Defendants themselves have paid MONGE to pose
13   for pictures which were published in their magazine entitled "H Para Hombres." (SUF No. 88,
14   89). MAYA MAGAZINES paid MONGE to model in a 2008 issue and a 2009 issue of the
15   United States edition of "H Para Hombres." (SUF No. 79). In addition, Defendants have
16   previously sold photographs of MONGE through a profit-sharing agreement with REYNOSO.
17   (SUF No. 84).

18   REYNOSO has also been paid multiple times for photographs of himself with his ex-
19   wife Pilar Montenegro, including at vacations, parties and birthdays. (SUF No. 80).
20   REYNOSO was paid $25,000.00 for photographs of his wedding to Ms. Montenegro. (SUF
21   No. 81). REYNOSO was also paid $20,000.00 and received the additional value of a
22   $20,000.00 vacation to Paris for photographs of him on vacation with Ms. Montenegro, for a
23   total value of $40,000.00. (SUF No. 82).

24   Other magazines would have been interested in the first publication of the Photographs
25   and would have been willing to pay for them. (SUF No. 83).

26   ///

27   ///

28   ///

**E.      Defendants' Earned In Excess of $81,767.21 In Gross Revenues From the Issue of the Magazine Featuring The Photographs**

MAYA PUBLISHING sold the Magazine in the United States, El Salvador, Costa Rica, Honduras and Nicaragua.  (SUF No. 72).  MAYA PUBLISHING sold 34,505 copies of the Magazine in the United States and its territories.  (SUF No. 74).  The retail price of the Magazine is $3.29 and the wholesale price averages $1.60 in the United States and its territories. (SUF No. 75).  MAYA PUBLISHING sold 907 copies of the Magazine outside of the United States and its territories.  (SUF No. 76).  The retail price of the Magazine is $2.50 and the wholesale price is $1.36 outside of the United States and its territories.  (SUF No. 77). In addition, MAYA PUBLISHING had 5,424 subscribers for the Magazine when it was published and earned $25,325.69 in advertising revenue from the Magazine in the United States and its territories.  (SUF Nos. 73, 78).

**F.      Defendants Have Acknowledged That the Photographs Are Valuable**

Ana Rivaroli ("Rivaroli") has worked with Defendants for approximately ten years as the General Manager.  (SUF Nos. 32, 33, 34, 35, 36).  As the General Manager, her current job duties are to manage and control the daily operations of MAYA PUBLISHING.  (SUF No. 37). Rivaroli believes that what appears on the cover of TVNotas is of utmost importance to MAYA PUBLISHING when it comes to the magazine's circulation.  (SUF No. 38).  Further, she believes that the cover drives sales of the magazine.  (SUF No. 39).  Rivaroli acknowledged that the Photographs are valuable.  (SUF No. 43).  Of the 400 photographs of Plaintiffs received by Defendants, Defendants only published the Photographs.  (SUF No. 45).

Garcia has worked for Defendants for over nine years and is the editor of TVNotas. (SUF Nos. 49, 51, 52).  As the editor, he is responsible for the content that goes into TVNotas, including the photographs.  (SUF No. 53).  Garcia selected the content that went into the Magazine and chose to put some of the Photographs on its cover.  (SUF Nos. 54, 55). Garcia chose to publish the Photographs, which consists of all the photographs depicting Plaintiffs' wedding.  (SUF No. 65).

///

1

## III.

2

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

3       On a motion for summary judgment, the moving party has the burden of establishing

4  the nonexistence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317,

5  330 (1986).  To meet this burden, the moving party may either submit evidence that negates

6  an essential element of the nonmoving party's claim or may demonstrate that the nonmoving

7  party's evidence is insufficient to establish an essential element of the nonmoving party's

8  claim.  Id.  Although the moving party bears the initial burden of demonstrating the absence

9  of a genuine issue of material fact, the moving party has no burden to negate or disprove

10  matters on which the nonmoving party will have the burden of proof at trial.  Id.  The moving

11  party need only point out to the court that there is an absence of evidence to support the

12  nonmoving party's case. Id. at 325.

13       The burden then shifts to the nonmoving party to "designate specific facts showing that

14  there is a genuine issue for trial."  Id. at 324 (internal citations and quotation marks omitted).

15  To carry this burden, the nonmoving party must "do more than simply show that there is some

16  metaphysical doubt as to the material facts."  Matsushita Electric Indus. Co., Ltd. v. Zenith

17  Radio Corp., 475 U.S. 574 (1986).  "The mere existence of a scintilla of evidence . . . will be

18  insufficient; there must be evidence on which the jury could reasonably find for the

19  [nonmoving party]."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  If the

20  nonmoving party's evidence is insufficient to demonstrate the existence of a genuine issue

21  of material fact, summary judgment should be granted.  Fed.R.Civ.P. 56(e).

22       Where a party raises affirmative defenses to the claims raised in a complaint, that party

23  bears the burden of proof at trial as to each element of the affirmative defenses.  Tovar v.

24  U.S. Postal Service, 3 F.2d 1271, 1284 (9th Cir. 1993).  A plaintiff satisfies its burden on

25  summary judgment by showing to the Court that there is an absence of evidence to support

26  the nonmoving party's claims or defenses.  In re Brazier Forest Products, Inc., 921 F.2d 221,

27  223 (9th Cir. 1990).

28  ///

1   Defendants have not provided any evidence on which a jury could reasonably find for

2   Defendants on any of their affirmative defenses.  Therefore, Plaintiffs are entitled to partial

3   summary judgment as to all of Defendants' affirmative defenses.  Fed.R.Civ.P. 56(c).

4   **IV.**

5   **DEFENDANTS' FIRST AFFIRMATIVE DEFENSE OF**

6   **"WAIVER, ACQUIESCENCE AND ESTOPPEL" FAILS AS A MATTER OF LAW**

7   Defendants' first affirmative defense is actually three separate affirmative defenses.

8   Each relies on Defendants' theory that Plaintiffs' intended to "leak" the Photographs.  There

9   is no evidence to support this theory.  Thus, each affirmative defense in Defendants' first

10   affirmative defense fails as a matter of law.

11   **A.   There Is No Evidence of Any Waiver of Known Rights By Plaintiffs In the**

12   **Photographs**

13   "Waiver is the intentional relinquishment of a known right with knowledge of its

14   existence and the intent to relinquish it."  United States v. King Features Entertainment, Inc.,

15   843 F.2d 394 (9th Cir. 1988).  Defendants are alleging that Plaintiffs intended to "leak" the

16   Photographs to Viqueira, and further intended that Viqueira forward them on for publication.

17   Defendants have not provided any evidence to support Plaintiffs' intent to relinquish any of

18   their known rights in the Photographs.  There is also no evidence that Plaintiffs gave the

19   Photographs to Mr. Viqueira.

20   On the contrary, there is evidence that no such intent existed.  Plaintiffs never

21   authorized Defendants or Viqueira to use the Photographs in any manner.  Plaintiffs never

22   signed any releases concerning the Photographs.  Plaintiffs did not even tell anyone about

23   the Photographs or show anyone the Photographs, including REYNOSO's own mother.

24   Plaintiffs did not even know that anyone else had copies of the Photographs until after they

25   were published in the Magazine.

26   Moreover, REYNOSO did not know Viqueira at the time that Viqueira supposedly

27   obtained the Photographs.  REYNOSO does not recall if he ever even met Viqueira.  There

28   is no evidence that MONGE ever had any conversations with Viqueira about the Photographs.

8

1   Finally, there are no documents signed by Plaintiffs granting any rights in the Photographs to

2   Viqueira or Defendants.   Accordingly, as there is no evidence of Plaintiffs' intentional

3   relinquishment of their known rights in the Photographs, Defendants' affirmative defense of

4   "waiver" fails as a matter of law.

5       **B.**   **There is No Evidence of Plaintiffs' Acquiescence to Defendants'**

6           **Publication of the Photographs**

7       "The plaintiff's acquiescence in the defendant's infringing acts may, if continued for a

8   sufficient period of time and if manifested by overt acts, result in an abandonment of

9   copyright." Tolliver v. McCants, 2010 U.S. Dist. LEXIS 4597, *10 (S.D.N.Y., Jan. 21, 2010).

10  There is no evidence of Plaintiffs' acquiescence to Defendants' publication of the

11  Photographs.   Instead, it is clear that Plaintiffs' were not aware that Defendants were going

12  to publish the Photographs prior to their publication.   Plaintiffs did not even know Defendants

13  had the Photographs until after they were published.   Following the publication, there is no

14  evidence of anything that would even suggest such acquiescence.   Instead, the instant action

15  was promptly filed.   Therefore, Defendants' affirmative defense of "acquiescence" fails as a

16  matter of law.

17      **C.**   **There is No Evidence To Support That Plaintiffs Should Be Estopped From**

18          **Asserting Copyright Infringement Against Defendants**

19      Defendants must prove four elements to prevail on a defense of estoppel:

20          (1) The party to be estopped must know the facts; (2) he must intend that his
    conduct shall be acted on or must so act that the party asserting the estoppel

21          has a right to believe it is so intended; (3) the latter must be ignorant of the true
    facts; and (4) he must rely on the former's conduct to his injury. Hampton v.

22          Paramount Pictures Corp., 279 F.2d 100, 104 (9th Cir. 1960).

23  "The doctrine of equitable estoppel does not erase the duty of due care and is not available

24  for the protection of one who has suffered loss solely by reason of his own failure to act or

25  inquire." Id. at 104.   Accordingly, in Hampton the defense of estoppel to copyright

26  infringement was precluded because the defendant relied on the assertion of a proper grant

27  of rights by a third party but failed to ascertain whether the grant of rights was proper. Id. at

28  104-105.

1    In the instant matter, Defendants cannot prove any element of estoppel.  First, there
2    is no evidence that Plaintiffs knew that the Photographs were going to be published by
3    anyone, including Defendants.  On the contrary, Plaintiffs' didn't even know that Defendants
4    had copies of the Photographs, let alone that they intended to publish them, until after they
5    were published and REYNOSO was told about the publication by his mother.

6    Second, there is no evidence that Plaintiffs intended to grant the right to publish the
7    Photographs to anyone, including Viqueira or Defendants.[1]  Defendants' claim of estoppel
8    rests upon their alleged "leaking" of the Photographs to Viqueira.  Instead, Plaintiffs never
9    authorized Defendants or Viqueira to publish the Photographs.  Plaintiffs never gave the
10   Photographs to Viqueira, discussed them with him or told him about them.

11   Third, Defendants' alleged ignorance of the facts is not excused because it was willful.
12   Hampton, 279 F.2d at 104-105.  Defendants knew that Viqueira was a "paparazzo" yet still
13   failed to investigate if he had validly assigned them the proper rights to the Photographs.
14   Instead, Defendants buried their head in the sand and now argue that their willful ignorance
15   should excuse their infringement.  Defendants did not ask how Mr. Viqueira obtained rights
16   to the Photographs nor to see any documentation or releases proving that he had rights to
17   the Photographs.

18   Finally, there is no evidence that Defendants relied on Plaintiffs' conduct to their
19   detriment.   If Defendants relied on any conduct at all, it was that of Viqueira – not Plaintiffs.
20   Accordingly, Defendants' affirmative defense of "estoppel" fails as a matter of law.

21   ///
22   ///
23   ///
24
25
26

27   [1]   Any evidence produced of Plaintiffs' motive or intent will preclude summary
judgment, as "determinations of motive and intent are questions better suited for the jury."
28   Gener-Villar v. Adcom Group, Inc., 509 F.Supp.2d 117, 121 (D. Puerto Rico 2007) (internal
citations and quotation marks omitted).

10

## V.

## DEFENDANTS' FOURTH AFFIRMATIVE DEFENSE OF

## "INNOCENT INFRINGEMENT" FAILS AS A MATTER OF LAW

"Innocent infringement" is not an affirmative defense to copyright infringement. Gener-Villar v. Adcom Group, Inc., 509 F.Supp.2d 117, 125 (D. Puerto Rico 2007). "[T]he Copyright Act is a strict liability regime under which any infringer, whether innocent or intentional, is liable." Id. at 124. The determination of whether an infringement of copyright was "willful" or "innocent" is instead relevant to the amount of statutory damages that a plaintiff may recover from an infringer. Id. at 125; see also 17 U.S.C. § 504(c)(2). "Innocent infringement" is not even relevant to the instant matter as Plaintiffs have not elected to seek statutory damages. Thus, Defendants' fourth affirmative defense of "innocent infringement" fails as a matter of law.

## VI.

## DEFENDANTS' FIFTH AFFIRMATIVE DEFENSE OF

## "ACTIONS OF OTHERS" FAILS AS A MATTER OF LAW

"Actions of others" is not an affirmative defense to copyright infringement. As indicated above, copyright infringement is a strict liability regime. Gener-Villar, 509 F.Supp.2d at 124. "Copyright would lose much of its value if third parties such as publishers and producers were insulated from liability because of their innocence as to the culpability of the persons who supplied them with the infringing material." Id. at 125 (internal citations and quotation marks omitted). Whether Defendants knew if Viqueira actually had the legal right to assign rights to the Photographs is immaterial. Id. at 125. Accordingly, Defendants' fifth affirmative defense of "actions of others" fails as a matter of law.

///

///

///

11

1

2

3

**VII.**

**DEFENDANTS' THIRD AFFIRMATIVE DEFENSE OF**

**"FIRST AMENDMENT" FAILS AS A MATTER OF LAW**

4  The "First Amendment" on its own is not an affirmative defense to copyright

5  infringement.  First Amendment concerns are subsumed within the "fair use" inquiry of the

6  Copyright Act.  Los Angeles News Service v. Tullo, 973 F.2d 791, 795 (9th Cir. 1992); see

7  also Elvis Presley Enterprises, Inc. v. Passport Video, 349 F.3d 622, 626 (9th Cir. 2003);

8  Pacific and Southern Co., Inc. v. Duncan, 572 F.Supp. 1186, 1192 (N.D.Ga. 1983).  No court

9  has recognized a First Amendment exception to copyright other than "fair use."  Los Angeles

10  News Service v. Tullo, 973 F.2d at fn 5;  Pacific and Southern Co., 572 F.Supp. at 1192.

11  When ideas may be expressed without copying protected expression, a First Amendment

12  challenge must be dismissed.  Walt Disney Productions v. Air Pirates, 581 F.2d 751, 759 (9th

13  Cir. 1978).

14  In *dicta*, some courts have noted Professor Nimmer's view that a compulsory license

15  should exist to protect the First Amendment interests in information vital to the public dialogue

16  where the idea and expression are inseparable.  The prototypical examples used in support

17  of such a license are the photographs of the My Lai massacre during the Vietnam War and

18  the video footage of the Kennedy assassination.  Nimmer has noted that, in reporting on such

19  a massacre, the "idea" of a massacre is no substitute for the insight that would be gained

20  through viewing news photographs of it.  Los Angeles News Service v. Tullo, 973 F.2d at 795-

21  796.  However, no court has adopted Nimmers' suggested compulsory license.  Id. at fn 5;

22  see also Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 559 (1985)

23  (noting that the Supreme Court specifically declined to impose a "'compulsory license'

24  permitting unfettered access to the unpublished copyrighted expression of public figures.").

25  Further, it has been noted that such a license would only be considered on extraordinary facts

26  and is specifically inapplicable to "soft-news" and other news stories not on par with the My

27  Lai massacre.  Los Angeles News Service v. Tullo, 973 F.2d at fn 5.

28  ///

1    In the instant matter, the Photographs depict Plaintiffs' secret wedding and wedding

2  night.  The story of a wedding, even a secret celebrity wedding, is clearly not in a category of

3  news on par with the My Lai massacre.  Thus, even if Plaintiffs' wedding is considered news,

4  the story would at most be considered "soft news" for which a purported compulsory license

5  is inapplicable.  Los Angeles News Service v. Tullo, 973 F.2d at fn 5.

6    Moreover, if Defendants' were solely concerned with the dissemination of news

7  information, they could have reported the facts of the wedding without publishing the

8  Photographs.  Any concerns of proof could have been dispelled by obtaining a copy of

9  Plaintiffs' marriage certificate which is public record.  It would be incredible to maintain that

10  the "idea" of Plaintiffs' wedding is inseparable from the pictures of it.

11    Finally, a First Amendment compulsory license is not an affirmative defense.

12  Fundamental to the idea of a compulsory license is that the copyright holder is compensated

13  for the use of their work.  See 17 U.S.C. § 115(c).  Defendants have not paid Plaintiffs any

14  compensation for the use of the Photographs, and have not offered to do so.

15    Based thereon, the affirmative defense of "First Amendment" fails as a matter of law.

16                                    **VIII.**

17              **DEFENDANTS' SECOND AFFIRMATIVE DEFENSE OF**

18                **"FAIR USE" FAILS AS A MATTER OF LAW**

19  "Fair use is a mixed question of law and fact."  In Harper & Row, 471 U.S. at 560; Los

20  Angeles News Service v. Tullo, 973 F.2d at 796.  However, a court may conclude as a matter

21  of law that a use of a copyrighted work is not a fair use.  Id.  It is hard to overstate the extent

22  to which the facts and corresponding legal analysis of Harper & Row, the preeminent case

23  on fair use, are directly on point with the instant matter.

24    In Harper & Row, the defendants published lengthy verbatim excerpts of President

25  Ford's unpublished manuscript.  The defendants explained that they merely published "a real

26  hot new story" about the memoirs of a prominent public figure – a U.S. president.  Id. at 543.

27  The defendants further argued that the expression itself was newsworthy and that public's

28  interest in obtaining the news "as fast as possible" outweighed the copyright owner's right of

1    first publication.  Id. at 556.  The Supreme Court rejected the defendants' arguments.  Id. at

2    557.

3         In analyzing the case, The Supreme Court held that the unpublished nature of a work

4    is a key factor tending to negate a defense of fair use.  Id. at 551.  The Court then analyzed

5    the four factors that are relevant in determining whether a use of a copyrighted work is fair

6    use: "(1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the

7    substantiality of the portion used in relation to the copyrighted work as a whole; (4) the effect

8    on the potential market for or value of the copyrighted work."  Id. at 560-561; Los Angeles

9    News Service v. Tullo, 973 F.2d at 797; see also 17 U.S.C. § 107.  Based thereon, the Court

10   held that the publication was not fair use.  Harper & Row, 471 U.S. at 569.

11        In the instant matter, Defendants published Plaintiffs' unpublished Photographs in the

12   Magazine.  In doing so, each fair use factor weights against a finding of fair use.  First, the

13   use was commercial, was not done in the spirit of good faith and fair dealing, and was not

14   transformative.   Second, Defendants focused on the most expressive elements of the

15   Photographs which Plaintiffs had attempted to keep private.  Third, Defendants used the

16   "heart" of the work by publishing every picture depicting Plaintiffs' wedding and wedding night

17   in their entirety.   Fourth, if Defendants were given a wholesale license to publish the

18   copyrighted photographs of celebrities without authorization under the guise of new reporting,

19   it would destroy the potential market to exploit such photographs.  Thus, Defendants' second

20   affirmative defense of "fair use" fails as a matter of law.

21        **A.    Defendants' Preemption of Plaintiffs' First Publication Rights Outweighs**

22   **          a Claim of "Fair Use"**

23        A copyright owner has the right to control the first publication of his or her work under

24   § 106 of the Copyright Act.  Harper & Row, 471 U.S. at 552.  Pursuant to Congressional

25   intent, the unpublished nature of a work is a prominent factor in the fair use analysis.  The fair

26   use defense is narrowly limited for unpublished works.  Id. at 553.

27        In Harper & Row, 471 U.S. at 556, the defendants argued that the public's interest in

28   obtaining quick access to news of high public concern, especially where the copyrighted

14

expression is itself newsworthy, outweighed a copyright owner's right to first publication. The Supreme Court specifically rejected this, noting that this theory:

> would expand fair use to effectively destroy any expectation of copyright protection in the work of a public figure . . . The promise of copyright would be an empty one if it could be avoided merely by dubbing the infringement a fair use "news report" . . . Id. at 557.

The Court held that a copyright owner's right to control the first publication of an unpublished work will ordinarily outweigh a claim of fair use, even if the work has "short-term 'news value.'" Id. at 555. The Court recognized that the exclusive right to first publication is commercially valuable for the copyright owner and declined to damage this right through "judicially enforced 'sharing.'" Id. at 553.

> The public interest in the free flow of information is assured by the law's refusal to recognize a valid copyright in facts. The fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public importance. Id. at 558 (internal citations and quotation marks omitted).

Moreover, the Court held that "[i]t is fundamentally at odds with the scheme of copyright to accord lesser rights in those works that are of greatest importance to the public." Id. at 559. "[F]reedom of thought and expression includes both the right to speak freely and the right to refrain from speaking at all." Id. (internal citations and quotation marks omitted).

In the instant matter, Defendants have usurped Plaintiffs' rights to first publication. Defendants' actions amount to corporate theft of the Photographs under a strained theory of reporting the "news" of Plaintiffs' secret wedding. It would be incredible to find that any news value in the Photographs would exceed the newsworthiness of a U.S. President's personal account of a significant time in American history – as indicated above, the use of the President's work was held to not be a fair use.

Instead, the story of a wedding, even a secret celebrity wedding, is commonplace and the facts of any news story could have easily been expressed with words only and without infringing Plaintiffs' copyrights. For factual verification, Defendants could have obtained a copy of the marriage certificate which is public record. Certainly the story could have been expressed without using every available photograph depicting the wedding. Thus,

15

1   Defendants' use of the Photographs weighs even more strongly against fair use than the

2   defendants' use in Harper & Row.

3        In addition, Defendants have destroyed Plaintiffs' ability to profit from the exclusive

4   rights of first publication of the Photographs.  Moreover, Defendants have violated Plaintiffs'

5   First Amendment right to refrain from publishing the Photographs at all, and Plaintiffs' intent

6   and efforts to maintain the secrecy of the Photographs is well-evidenced.

7        Thus, like in Harper & Row, Defendants' unauthorized first publication of the

8   Photographs outweighs Defendants' strained claim of fair use.

9   **B.    Each of the Four Factors of the "Fair Use" Analysis Weighs Against**

10  **Defendants' Claim of "Fair Use"**

11       **1.    The Purpose and Character of the Use**

12       Defendants claim that their use of the Photographs was for "news reporting."  Although

13  "news reporting" is an example of items eligible for fair use under 17 U.S.C. § 107, there is

14  no presumption of fair use for news reporting.  Harper & Row, 471 U.S. at 561; Los Angeles

15  News Service v. Tullo, 973 F.2d at 797.  Instead, "[t]he issue is not what constitutes 'news,'

16  but whether a claim of newsreporting is a valid fair use defense to an infringement of

17  copyrightable expression."  Harper & Row, 471 U.S. at 561 (internal citations and quotation

18  marks omitted).

19       A commercial use, as opposed to nonprofit, weighs against a finding of fair use.  "The

20  crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary

21  gain, but whether the user stands to profit from exploitation of the copyrighted material without

22  paying the customary price."  Harper & Row, 471 U.S. at 562.  A commercial use also

23  includes "the intended purpose of supplanting the copyright holder's commercially valuable

24  right of first publication."  Id.  Making a "news event" out of the unauthorized first publication

25  of a work weighs against a finding of fair use.  Id. at 561.  "The fact that the defendant focuses

26  on the giving rather than the taking cannot hide the fact that profit is its primary motive for

27  making the exchange."  Los Angeles News Service v. Tullo, 973 F.2d at 797-798.  "Fair use

28  ///

1   presupposes 'good faith' and 'fair dealing.'" Harper & Row, 471 U.S. at 562 (internal citations
2   and quotation marks omitted).

3        In the instant matter, Defendants' use was clearly commercial, as they were able to
4   profit from publishing the Photographs without paying the customary price to Plaintiffs.  This
5   is evidenced by the fact that Defendants have actually paid Plaintiffs to publish other
6   photographs.  Moreover, within the same issue of the Magazine, Defendants payed another
7   celebrity to publish her wedding photographs.  In addition, the headlines of the Magazine
8   evidence the fact that Defendants attempted to make a news event out of the unauthorized
9   first publication of the Photographs. Thus, Defendants' use of the Photographs was
10  overwhelmingly commercial.

11       Another essential component of the "purpose of character of the use" is whether the
12  use was transformative.  Los Angeles News Service v. CBS Broadcasting, Inc., 305 F.3d 924,
13  938 (9th Cir. 2002); Elvis Presley Ent., 349 F.3d at 628.  That is, "whether the new work . . .
14  merely supersedes the objects of the original creation, or instead adds something new, with
15  a further purpose or difference character, altering the first with new expression, meaning, or
16  message." Elvis Presley Ent., 349 F.3d at 628 (internal citation and quotation marks omitted).
17  "There must be real, substantial condensation of the materials." Elvis Presley Ent., 349 F.3d
18  at 628 (internal citation and quotation marks omitted).  Adding a voice-over to a work is not
19  a transformative use of the work.  Id. at 628; Los Angeles News Service v. CBS, 305 F.3d at
20  939.

21       In the instant matter, Defendants have merely reprinted large copies of the
22  Photographs on the cover of the Magazine, and over a two-page spread within it.  Like with
23  voice-overs, the headlines and captions that were added are not a transformative use of the
24  work.  Instead, the real focus of the use is on the expression of the Photographs themselves.
25  Thus, Defendants' use of the Photographs was not transformative.

26       Accordingly, because Defendants' use of the Photographs was commercial and not
27  transformative, the first factor weighs against a finding of fair use.

28  ///

### 2.    The Nature of the Copyrighted Work

Photographs fit squarely within the core of copyright protection.  Elvis Presley Ent., 349 F.3d at 629.   In analyzing the nature of the copyrighted work, several inquiries are appropriate.   First, unpublished works are less likely to qualify for fair use than published works.   Id. at 629.   Second, going beyond the dissemination of facts to focus on the most expressive elements of the work weighs against a finding of fair use.   Harper & Row, 471 U.S. at 563-564.   Third, a copyright holder's efforts to maintain the confidentiality of a work also weighs against a finding of fair use.   Id. at 564.

As to the instant matter, first, the Photographs were unpublished works.   Second, the Magazine focuses on the expressive elements of the Photographs themselves – the headlines and captions merely add context and actually emphasize the focus on the Photographs.   Third, Plaintiffs took efforts to maintain the confidentiality of the Photographs by not discussing the Photographs with anyone, nor showing or giving the Photographs to anyone.   Accordingly, the second factor weighs against Defendants.

### 3.    The Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole

"This factor evaluates both the quantity of the work taken and the quality and importance of the portion taken."  Elvis Presley Ent., 349 F.3d at 630.   First, In respect to the quantity, copying an "insubstantial" part of the entire work does not excuse the infringement.  "The fact that a substantial portion of the infringing work was copied verbatim is evidence of the qualitative value of the copied material, both to the originator and to the plagiarist who seeks to profit from marketing someone else's copyrighted expression."  Harper & Row, 471 U.S. at 565; see also Elvis Presley Ent., 349 F.3d at 630.   Second, In respect to the "quality and importance of the work taken," courts should "look to see whether 'the heart' of the copyrighted work is taken – in other words, whether the portion taken is the most likely to be newsworthy and important in licensing serialization."  Elvis Presley Ent., 349 F.3d at 630 (internal citations and quotation marks omitted).   Using the "heart" of a copyrighted work supports a finding that the use was not fair use.  Id.; Harper & Row, 471 U.S. at 564-565.

18

Third, if the infringer uses more than is necessary for the intended use, this factor will weigh against the a finding of fair use. Elvis Presley Ent., 349 F.3d at 630; see also Los Angeles News Service v. CBS, 305 F.3d at 941.

Defendants published the Photographs in their entirety.  Each of the Photographs on its own is a copyrightable work and thus Defendants quantitatively and qualitatively used the entire works.  Even if the amount of the photographs published is placed in light of the fact that Defendants purchased 400 photographs of Plaintiffs, like the printed excerpts in Harper & Row, the six Photographs are the "heart" of the photographs.  That is, Defendants published every photograph depicting Plaintiffs' wedding, as well as the most effective and illustrative photographs from their wedding night.  In doing so, Defendants published what they thought their customers would think are the best photographs – their "heart."   As indicated above, Defendants printed more than necessary for the alleged intended use of reporting on Plaintiffs' wedding.  Accordingly, the third factor weighs against Defendants.

### 4.     The Effect on the Potential Market for or Value of the Copyrighted Work

The effect on the potential market for the copyrighted works is the most important element of fair use.  Harper & Row, 471 U.S. at 566.  "Fair use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied."  Id. at 566-567 (internal citations and quotation marks omitted).  To negate fair use, one need only show that, if the challenged use "should become widespread, it would adversely affect the potential market for the copyrighted work."  Id. at 568 (internal citations and quotation marks omitted).  Actual damage to the market is irrelevant because 17 U.S.C. § 107 looks to the potential market.  Los Angeles News Service v. Tullo, 973 F.2d at 799.  If the use was commercial, the likelihood of future harm may be presumed and thus weighs against fair use.  Los Angeles News Service v. Tullo, 973 F.2d at 798; Elvis Presley Ent., 349 F.3d at 631.  The more transformative the work, the less likely it will adversely affect the market for the original work.  Elvis Presley Ent., 349 F.3d at 631.

///

1    For example, in Harper & Row, the Supreme Court held that using verbatim quotes

2    from the unpublished manuscript gave the story "a special air of authenticity" which "directly

3    competed for a share of the market for prepublication excerpts."  Harper & Row, 471 U.S. at

4    568.  The Court held that this weighed against a finding of fair use because otherwise the fair

5    use doctrine would pose "substantial potential for damage to the marketability" of the

6    copyright owner's rights in the unpublished work.  Id. at 569.

7    In the instant matter, Defendants have damaged Plaintiffs' potential market to sell the

8    Photographs by usurping Plaintiffs' right of first publication of the Photographs.  The value of

9    the first publication rights in the Photographs is evidenced by Defendants' own actions –

10   Defendants' purchase of the Photographs from Viqueira was contingent upon obtaining the

11   exclusive rights to publish them.  Defendants have evidenced that the Photographs are

12   valuable, both in testimony and through their action of purchasing them.  Since Defendants

13   have misappropriated Plaintiffs' ability to market the exclusive rights to publish the

14   Photographs, Defendants have destroyed the potential marketability of the Photographs.

15   Whether Plaintiffs actually intended to publish the Photographs is irrelevant to the analysis

16   of the potential market.  This weighs against a finding of fair use.

17   Further, as set forth above, Defendants' use of the Photographs was commercial.

18   Defendants profited from the use by publishing the Photographs without paying the customary

19   price to Plaintiffs.  Defendants have acknowledged that celebrity photographs are valuable;

20   they have purchased them, have a budget to obtain them, and even pay for photographers

21   and airfare to obtain them.  The evidence also shows that photographs of Plaintiffs are

22   valuable.  Plaintiffs have been paid tens of thousands of dollars for photographs featuring

23   them.  In fact, Defendants themselves have even paid MONGE to pose for and grant the right

24   to publish other photographs of her.  These other pictures were published on the cover of,

25   and within, no less than two issues of another of Defendants' magazines entitled "H Para

26   Hombres."  Even within the Magazine where the Photographs were published, Defendants

27   paid for the rights to publish other celebrity wedding photographs.  This commercial use

28   weighs against a finding of fair use.

1    In addition, Defendants use of the Photographs was not transformative.  Defendants

2    printed the Photographs in their entirety on the cover of the Magazine as well as over a two-

3    page spread within it.  The mere addition of headlines and captions is not a transformative

4    use.  Instead, the content of the headlines and captions shows that Defendants were actually

5    attempting to create a news event out of the unauthorized first publication of the Photographs.

6    Thus, the focus of Defendants' use is on the Photographs themselves.   This non-

7    transformative use weighs against a finding of fair use.

8        Finally, if the practice of publishing celebrity photographs without paying the customary

9    price should become widespread, it would severely affect the potential market for copyrighted

10   works featuring celebrities.  Defendants' argument of fair use is, in essence, that photographs

11   depicting celebrities are newsworthy and thus not subject to copyright protection.  This is

12   inconsistent with Defendants' own practice of purchasing photographs of celebrities to

13   publish.   Defendants have purchased such photographs and have a budget to do so.

14   Defendants even paid for celebrity wedding photographs published in the same Magazine as

15   the Photographs.  Clearly if Defendants and other magazine publishers are allowed to skirt

16   copyright owners' rights to control the publication of photographic works featuring celebrities,

17   the entire potential market for celebrity photographs would be eviscerated.   This is a

18   substantial market and the exact market that Defendants' magazine TVNotas caters to.  In

19   addition, Viqueira himself would be out of a job if magazine publishers could publish

20   photographs he had taken without paying him the customary price.  Accordingly, the fourth

21   factor weighs against a finding of fair use.

22       In conclusion, since each factor weighs against a finding of fair use, Defendants'

23   second affirmative defense of "Fair Use" fails as a matter of law.

24   ///

25   ///

26   ///

27

28

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGEMENT**

1

**IX.**

2

**CONCLUSION**

3      For the foregoing reasons, Plaintiffs, NOELIA LORENZO MONGE and JORGE

4   REYNOSO respectfully request that this Court grant their motion for partial summary

5   judgment as requested herein.

6

7                                   Respectfully Submitted,

8

9   Dated: June 1, 2010                    By:    /s/ Michael Kuznetsky
                                                  _____
10                                               Michael D. Kuznetsky, Attorney for Plaintiffs
                                                 FATTOROSI & ASSOCIATES, P.C.
11                                               5850 Canoga Avenue, Suite 400
                                                 Woodland Hills, California 91367
12                                               michael@fattlegal.com
                                                 Telephone No.: 818-881-8500

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28